404 A.2d 495.

STATE *vs.* RALPH BYRNES *et al.*

JULY 31, 1979.

PRESENT: Joslin, Kelleher, Doris and Weisberger, JJ.

KELLEHER, J.   After an unusually lengthy trial, a Superior Court jury returned a verdict in which it found that on August 14, 1975, the defendants, Ralph Byrnes, Charles Flynn, and John Ouimette, were participants in the so-called Bonded Vault robbery. Thereafter, the trial justice imposed life sentences on each defendant, and they in turn appealed. The defendants are presently before us on their appeal from the denial by a Superior Court justice of their respective motions, in which they claim to be indigent and ask that the state pay for the cost of the transcript of the trial proceedings, including the voir dire of the prospective jurors. The transcript's estimated cost is $15,000. Hereinafter we shall refer to the defendants by their last names.

The three affidavits are, for the most part, identical. The affiants claim that they are unemployed and have been since the time of their arrest; they own no real estate, stocks, bonds, securities, or automobiles, and have "no cash on hand." Their personal effects were described as "clothing and certain other incidentals" having a cash value of less than $500. Ouimette reported that he received from the federal government a monthly disability check amounting to $646.90, all of which, he averred, was used for the support of his wife and 15-year-old child.

During the mid-March 1977 hearing, each defendant testified. Each direct examination consisted, for the most part, of a repetition of what was set forth in the corresponding affidavit. During Ouimette's cross-examination, the disclosure was made that the Ouimette family lives in a home

owned by his mother. The monthly rent for these premises amounted to $225. According to Ouimette, the last time he received a paycheck was sometime in 1971. Later, he acknowledged that sometime prior to 1974, he had pleaded guilty to a gambling charge, but he said the operation was a break-even situation in which he made a couple of dollars and lost a couple of dollars. When the prosecutor sought to inquire into Ouimette's post-1974 gambling ventures, Ouimette invoked the fifth amendment.

Ouimette described himself as one who had been "broke all [his] life." Despite this situation, he and his wife had at their disposal a 1973 Lincoln Continental and a Cadillac allegedly provided without cost by friends, including a couple of automobile dealers. He claimed that his family "just about got by" with the monthly check. The check was turned over to the wife who, according to Ouimette, was in complete charge of attending to the family's fiscal affairs. He was not sure how the bills were paid and he had absolutely no idea whether his wife paid by cash, check, or money order. During talk about the $15,000 downpayment made by his mother when she purchased the house the Ouimettes now occupy, Ouimette told the motion justice that he had no idea concerning his mother's source of income. While Ouimette did admit to doing some illegal gambling during the 1968-1974 period, he once again drew a blank about how much daily revenue it was generating; but he did say it "possibly" might have worked up to a figure of $500. However, according to Ouimette, the $500 daily operation came to a quick end.

Byrnes conceded that 3 weeks after the Bonded Vault holdup, he had ordered a new Lincoln Continental. The deposit on the Lincoln was $1,500, and the sales price was $11,000. At one point he explained that he was acting for his sister because she was busy and couldn't get to the dealer. Again, he pointed out that the reason he was doing the transaction was that he knew the salesman and was attempting to save his sister some money. On January 26, 1976, the sale was cancelled and the deposit returned. Byrnes

also acknowledged that one time when he was stopped by the Providence police in December 1975, a search disclosed that he had on his person some $2,600 in cash. Byrnes explained that the $2,600 was money he had received from Ouimette's niece after he had sold her car. Byrnes admitted to taking trips to Chicago and Las Vegas during the fall of 1977. He said that Flynn had paid for those trips, but at another point in his testimony he said he had paid for the trips.

Flynn's cross-examination began with gusto as the witness announced to the prosecutor and the trial justice and all assembled: "I would like to say one thing. I am broke, I have no property, I have nothing. I am not answering no more questions." Flynn apparently reconsidered, and when he resumed testifying, he denied that he had paid for his and Byrnes' westward excursions. Instead, he claimed the money came from Robert Dussault, an accused who had testified at the trial as a witness for the prosecution. Flynn also told the motion justice that Dussault had once given him $20,000 but that he had spent the entire amount by the time he went to prison. He reported that he had not been gainfully employed since 1969. He guessed that his trial attorneys had been paid by Dussault because "they weren't paid by me."

Flynn married Ellen Dempsey on Valentine's Day 1976. At that time he was incarcerated at the Adult Correctional Institutions awaiting trial. He had known Ellen for some time prior to the nuptials. Evidence was adduced from the manager of a Cranston bank indicating that sometime in December 1975, Ellen had applied for a mortgage so that she could complete the purchase of a house whose sales price was $77,900. Ellen had given the broker a $1,000 deposit. Later, on December 15, 1975, Ellen stopped by the bank and told the manager that she was withdrawing the application. At that time, Ellen reported, she was working at a television sales and service store.

The motion justice also heard from Sergeant Vincent Vespia, Jr., a member of the Rhode Island State Police. He testified that Ouimette was still a "major bookmaker." This

conclusion was based upon Vespia's surveillance of Ouimette as well as an incident in November 1975 when a search of Ouimette disclosed $500 cash and a bookmaker's tally sheet indicating that Ouimette was owed some $8,000.

We begin our consideration of the legal aspects of this appeal by first discussing an indigent's right to a free transcript. *Griffin* v. *Illinois*, 351 U.S. 12, 18-19, 76 S. Ct. 585, 590, 100 L. Ed. 891, 898 (1956), made it quite clear that poor defendants are entitled to the same appellate review afforded to the defendants who have the necessary wherewithal so that they can all furnish an adequate transcript for appellate review. Indigency is a relative concept which must be considered and measured in the light of the facts of each case. In attempting to define this elusive term, we subscribe to the sentiments expressed by the Supreme Court of Washington:

> "[T]he term does not and cannot, in keeping with the concept of equal justice to every man, mean absolute destitution or total insolvency. Rather, it connotes a state of impoverishment or lack of resources on the part of a defendant which, when realistically viewed in the light of everyday practicalities, substantially and effectually impairs or prevents his procurement of an adequate statement of facts and transcript necessary to a complete appellate review of his claims of error." *State* v. *Rutherford*, 63 Wash. 2d 949, 953, 389 P.2d 895, 898 (1964).

Most courts, when confronted with the issue now before us, have ruled that the burden rests upon the defendant to show both that he is indigent and that his appeal is not frivolous. *State* v. *Hudson*, 154 Conn. 631, 637, 228 A.2d 132, 135 (1967).[1] Our research has found only two states

[1]*See United States* v. *Anderson*, 567 F.2d 839, 840 (8th Cir. 1977); *United States* v. *Ellsworth*, 547 F.2d 1096, 1098 (9th Cir. 1977), *cert. denied*, 431 U.S. 931, 97 S. Ct. 2636, 53 L. Ed. 2d 247 (1977); *United States* v. *Schmitz*, 525 F.2d 793, 795 (9th Cir. 1975); *United States* v. *Kaufman*, 452 F.2d 1202, 1202 (4th Cir. 1971), *cert. denied*, 405 U.S. 989, 92 S. Ct. 1252, 31 L. Ed. 2d 455 (1972); *Wilson* v. *State*, 280 Ala. 167, 169, 190 So. 2d 720, 722 (1966); *State* v. *Reynolds*, 108 Ariz. 541, 545, 503 P.2d 369, 373 (1972); *Blair* v. *District of Columbia*, 200 A.2d 93, 95 (D.C. App. 1964); *Bruner* v. *State*, 581 P.2d 1314, 1316 (Okla. Crim. App. 1978); *State* v. *Bishop*, 241 S.C. 459, 461, 128 S.E.2d 914, 915 (1962).

which could arguably be said to support defendants' "burden shifting" contention. *See March* v. *Municipal Court,* 7 Cal. 3d 422, 429-31, 102 Cal. Rptr. 597, 601-02, 498 P.2d 437, 441-42 (1972), *State* v. *Rutherford,* 63 Wash. 2d 949, 954, 389 P.2d 895, 899 (1964). *But see State* v. *Clark,* 88 Wash. 2d 533, 534, 563 P.2d 1253, 1254 (1977).

We take the position that the burden of establishing indigency for purposes of receiving a trial transcript at state expense remains at all times on the defendant. The state is under no duty to rebut the assertions of indigency in the motion or to prove that the defendant's appeal is frivolous.

The defendants have supplied us with a copy of an unreported decision of the United States District Court for the District of Connecticut and claim that it holds that once a defendant introduces his affidavit of indigency, the burden then shifts to the prosecution to show otherwise. The District Court, in ordering that the transcript be supplied, had concluded that a financial affidavit was sufficient, absent contradiction by the state, to prove his indigency. We believe that at no time did the District Court ever shift the burden of proof to the government. We read its decision as merely saying that there are times when a defendant's financial affidavit may be sufficient, in and of itself, to sustain a plea of indigency, but the record presented in this case shows that the March 1977 hearing was not one of those times.

In his bench decision, the motion justice observed that the issue around which the testimony revolved was: "Are the defendants here unable to pay?" He also stressed that these three men had the burden of proof, and, in holding that they failed to sustain their burden, he pointed to Ouimette's inability to recall certain facts and details. Although Ouimette claimed that he had been penniless all his life, he did have an accountant whose name he could not recall. The motion justice also described Ouimette as "evasive" and alluded to his professed lack of knowlede regarding his wife's handling of the disability checks' proceeds and the amount of money he had on his person when arrested by the Providence

police on May 22, 1975, and earlier in 1968.[2] The motion justice also alluded to the $500 found on Ouimette by Sergeant Vespia on November 3, 1975, at a time when Ouimette presumably was not working and had no other source of income.

Byrnes' testimony was classified as "contradictory." The motion justice was unable to determine who accompanied Byrnes on his trips to Chicago and Las Vegas and who paid for the airline tickets. Byrnes' $1,500 downpayment and his picking out of the extras that were to go with the Lincoln Continental, he said, were at odds with an indigent's lifestyle.

Flynn's determination to stand fast and tell the prosecutor nothing produced a negative response. Such an attitude, the motion jusice said, made it impossible for him to believe that Flynn was giving an honest answer.

The motion justice recognized Ouimette's and Flynn's right to invoke the fifth amendment, but he also recognized that they still had the burden of convincing him of their indigency, and in that respect they failed. The failure was not due to their reliance on the fifth amendment, but on their evasive and contradictory statements. Accordingly, when all is said and done, the motion justice obviously did not believe either that Ouimette and Flynn were as "broke" as they said they were or that indigent people go around putting $1,500 deposits on $11,000 Lincoln Continentals.

We direct one final observation to the motion justice's passing reference about the inconsistency of affording a free transcript to a trio who had been found guilty of a robbery in which "this enormous amount of money was taken." This gratuitous comment, which came early in the decision, played no part in the ultimate determination. Once the reference had been made to the amount of the "loot," the motion justice turned his attention to the evidence before him and analyzed it. This shift becomes quite clear when one

---

[2]Ouimette could not recall having $1,504 of cash on hand as suggested by the question asked by the prosecutor, and the 1968 tally amounted to $1,679.

examines a later comment, in which the motion justice said: "I think the case hinges, not so much on the defense put in by the state, but on the fact that these three men have the burden of proof, and their case is so weak that it falls of its own weight."

Long ago in *State* v. *Hudson,* 55 R.I. 141, 153, 179 A. 130, 135-36 (1935), this court said that the power to appoint an attorney or provide a transcript to an indigent criminal defendant lies with the Superior Court, and the exercise of that power will not be disturbed unless there has been a clear abuse of the trial court's discretion. We see no such abuse.

The defendants' appeal is denied and dismissed, and the case is remanded to the Superior Court for further proceedings.

Mr. Chief Justice Bevilacqua did not participate.

*Dennis J. Roberts II,* Attorney General, *J.J.B. Wigglesworth, John S. Foley,* Special Assistant Attorneys General, for plaintiff.

*John F. Cicilline,* Providence, *William Kunstler,* New York, NY, for defendants.